SEXTON, Judge Pro Tempore.
|! Following a jury trial, Defendant Terry Lynn Terry was convicted of three counts of molestation of a juvenile in violation of La. R.S. 14:81.2. Thereafter, Defendant was sentenced to two concurrent sentences of 15 years’ imprisonment at hard labor on Counts I and II and 50 years’ imprisonment at hard labor on Count III. Twenty-five years of the 50-year sentence were ordered to be served without benefit of parole, probation or suspension of sentence. All sentences are to run concurrently and Defendant was given credit for time served. Defendant was notified of his requirement to register as a sex offender (upon release) and the trial judge imposed 30 days in parish jail “in lieu” of court costs. Defendant now appeals. We affirm Defendant’s convictions and sentences.

FACTS

Defendant was convicted of molesting three persons, A.L., T.C. and S.B.[1] A.L. and T.C. are sisters and the biological daughters of Defendant and his first wife. S.B. is the daughter of Defendant’s nephew.
In 2008, T.C. received a telephone call from an investigator attempting to contact Defendant about past-due payments on a vehicle. During the conversation, T.C. learned that her father had remarried and that there were two young children, a boy and a girl, living with them. T.C. was concerned because her estranged father had molested her and her sister, A.L., when they were younger. T.C. immediately contacted A.L., who in turn contacted the Office of Community Services (“OCS”) to report that Defendant had children in his home and that he had a prior history of | ¡¡molesting his daughters. Once OCS was able to locate its old files on Defendant, A.L. and T.C., A.L. was told that nothing could be done unless she pressed charges against Defendant. A.L. contacted Detective Dorothy Brooks of the Caddo Parish Sheriffs Department and discussed her concerns and reasons for moving forward with the allegations against her father. An investigation was conducted by the Caddo Parish Sheriffs Department, which ended with Defendant being charged with three counts of molestation of a juvenile.
Following a jury trial, Defendant was found guilty as charged on three counts of molestation of a juvenile in violation of La. R.S. 14:81.2(A) and (C) on two counts (victims A.L. and T.C.) and in violation of La. R.S. 14:81.2(A), (C) and (E) on one count (victim S.B.). Defendant filed motions for post-conviction judgment of acquittal and/or modification of judgment. In addition, a motion for new trial was filed. The motions were heard and denied by the trial court. Immediately thereafter, Defendant *132 was sentenced on Counts I and II to 15 years at hard labor and 20 days in jail in lieu of payment of court costs.[2] On Count III, Defendant was sentenced to 50 years at hard labor with 25 years of the sentence to be served without benefit of probation, parole or suspension of sentence and to 30 days in jail in lieu of court costs. The sentences were imposed concurrently and Defendant was given credit for time served. A timely motion to reconsider sentence was denied and this appeal ensued.
IsTrial Testimony
A.L., Defendant’s oldest daughter, was the first to testify. A.L. stated that she was born on January 31, 1980. A.L. testified that she and the family (A.L., her sister T.C., their brother S.T., their mother and Defendant) lived in several homes, including one in Shreveport. A.L. did not remember the first time her father touched her, but she testified, “I don’t really remember a first time per se. It just seems to be something that continued on. I could give you certain situations that I recall.” According to A.L., her father began touching her inappropriately when sh’e was in middle school. A.L. recalled first of being abused by Defendant at the family home on Riding Club Lane. Her mother, who had not worked for a long time, had gotten a job working nights at Wal-Mart.
While she was not certain about all the specifics of the instances of abuse, A.L. remembered that she would pretend to be asleep when her father would enter the room that she shared with her sister. Defendant would touch and fondle her - breasts and vaginal area while she pretended to be asleep.
A.L. was also able to recall instances when Defendant would take showers and “we would use a soap and help him rub himself.” A.L. stated that Defendant would be stimulated during that time. A.L. also recounted instances when Defendant would abuse her while helping her with homework. A.L. recalled one incident where Defendant was helping her with math homework and he had his hand inside her shirt. Her brother S.T. walked into the room and Defendant moved his hand very quickly. A.L. |4was unsure whether S.T. had seen anything, but she said there was a sudden tension in the room. A.L. did not know whether S.T. asked a question or said anything, but he walked out of the room and closed the door. According to A.L., Defendant usually locked the door, but not the time her brother walked in on them.
The fondling eventually progressed to oral sex before A.L. went to high school. A.L. testified in graphic detail how Defendant would perform oral sex on her, as well as having her perform oral sex on him. She stated her father begged her many times to allow him to have sex with her, to let him “put it in,” and while Defendant would rub his penis “all in the area,” there was never' any penetration. A.L. recalled this happening even when Defendant was living with his sister. Finally, A.L. recounted instances where Defendant would lay a towel on the floor in his room; A.L. was unclothed and Defendant rubbed baby oil all over her body.
At her boyfriend’s insistence, A.L. finally told her mother about the abuse. However, she testified that her mother was not very supportive of her and, while her mother did make Defendant leave the home, she allowed him to return sometime *133 later. A.L. testified that she was upset by Defendant’s return. She testified, “I hated him being there, ... it made me feel like nothing.” A.L. ran away to a friend’s home during this time, but returned when OCS was called. A short time later, A.L. went into foster care the summer before her freshman year in high school.
A.L. recalled that she and her sister T.C. were taken from the home, but her brother S.T. was allowed to stay. A.L. and her sister stayed with Rtheir foster parents for three months or so before her Aunt Linda (her mother’s sister) took them into her home.
A.L. indicated she did not want Defendant to have any more children, “[jjust for my own peace of mind.... I guess at the time it made me feel better to say it because I felt like I was doing something.” Once A.L. found out that Defendant had a girlfriend with a daughter and she wanted to warn Defendant’s girlfriend. A.L. wrote a letter to Defendant’s girlfriend. Defendant apparently intercepted the letter and contacted A.L. or her mother to express his displeasure with A.L. for sending the letter.
At this juncture, we note the later testimony of Dr. Ann Springer, a pediatrician at LSUHSC and the Medical Director at the CARA Center, which provides outpatient diagnosis and management for victims and suspected victims of all forms of child abuse and neglect. Dr. Springer stated that she examined A.L. on January 20, 1994, and A.L. had a normal exam. Dr. Springer opined, however, that a normal exam does not rule out sexual abuse. Most times, even when a child has been penetrated, healing has occurred by the time the child gets to medical care. Her diagnosis of A.L. was sexual molestation based on reported history.
As previously noted, in 2008, A.L. contacted OCS after receiving a call from her sister, T.C. A.L. stated that T.C., who lived in their childhood home with her own family, would periodically receive telephone calls from people who were trying to contact Defendant. T.C. didn’t usually share much information with A.L. about the calls; however, T.C. did contact A.L. at that time because she said she had a weird feeling about the most recent | ficall. A lady was attempting to contact Defendant to repossess his vehicle. T.C. was informed that Defendant had a wife and kids. Once A.L. received this information, she wanted the contact information to follow up on the matter.
A.L. called the person who had been attempting to locate Defendant and obtained some additional information. Thereafter, A.L. contacted OCS, telling them that she “had this horrible feeling I just knew something was wrong.” She wanted them to look further into it.
A.L. did not think that OCS was aware of her father’s history because the records had not been in the computer system. A.L. testified that she did not know if the children were male or female, but she “just had this overwhelming feeling that something was not right.” OCS told her that there was nothing they could do about it unless she pressed charges against her father. Prior to finding out that there were children in Defendant’s custody, A.L. had not considered pressing charges against her father. As stated, A.L. initially met with Det. Brooks regarding her complaint and provided the officer with information about Defendant’s past abuse of her. A.L. learned that the children in Defendant’s custody were the children of her paternal cousins, whom she had not met.
A.L. then learned that Defendant was arrested for molesting her, her sister T.C. and S.B. A.L. went to visit Defendant at *134 Caddo Correctional Center on the day he was arrested. She believed that she needed to do that for closure. T.C. made the visit with her. A.L. testified that Defendant | apologized to her for the things he had done to her. A.L. thought Defendant was apologizing for the abuse.
T.C. testified that she was born on April 18, 1985. The first home T.C. recalled her family living in was their grandfather’s house; they moved several times before moving to Riding Club Lane. In recalling the memory of the abuse, T.C. stated that they were living on Riding Club Lane, sometime around 1990 or 1991. T.C. was naked and Defendant was sitting on the toilet getting ready to run her bath water. T.C. said that she had one foot in the bathtub. T.C. remembered thinking while Defendant was kissing her that:
[H]e should not be kissing me like this, because it wasn’t a peck, it wasn’t, there wasn’t tongue involved, but it was, I remember thinking distinctly even at that age that he should not be kissing me like this, it felt wrong, and then after that, I felt extremely uncomfortable. And I didn’t want to look. I didn’t understand. You know, I don’t really know if he was touching me or not, but I know I went from thinking that he shouldn’t be kissing me like this to extremely uncomfortable and what ended up happening to stop it was, I kind of lifted my foot a little bit and the water went under my foot and I slipped. And I remember, you know, whoa, like a little girl and I remember after that I just got in [the] tub.'
T.C. described the kiss as being sensual. She went on to explain, “The word that, you know, like it’s how you might kiss your husband without tongue, you know, slow, soft and longer than, for what our relationship was, the kiss should not have happened that way, no, sir.” T.C. testified that she remembered some touching, but being so uncomfortable she could not say for sure what happened. She knew something was wrong, and she just felt stuck. In an interview with Det. Brooks, T.C. reported that she thought Defendant may have touched her because she remembered sensations or ^pressure in her vaginal area, but she was not sure; she was so uncomfortable that she just wanted things to stop. She did not look to see what Defendant was doing, but she vividly remembered the sensations and it made her think that Defendant was touching her.
T.C. remembered being interviewed at her elementary school when she was 9 years old. Linda Isaac, with the Department of Children and Family Services, testified that she was involved in the OCS investigation of A.L.’s allegations against Defendant in December 1993 and interviewed the two sisters at their schools. T.C. did not recall the substance of the entire conversation with Ms. Isaac, but she did remember being asked questions about her father and her sister. At the time of the interview, T.C. felt intimidated and scared. She did remember her conversations with A.L. when she was told that Defendant was doing things to her. T.C. also remembered that Ms. Isaac asked her about touching; and, in response to the question, T.C. gave an answer she believed would not get anyone in trouble, including her father. While T.C. knew that something was wrong, she did not know exactly what had happened to A.L. T.C. testified that she thought she was protecting her father at that point.
T.C. stated that she was conflicted about how she could honor her mother and father when her father had abused her. T.C. stated that she also felt badly about the fact that she never told anyone about the abuse. After telling her family about the abuse in 2004, T.C. did not do anything *135 further to pursue the matter until she received the call from the private investigator 19looking for Defendant and learned that Defendant was married and had two young children. This is why she called A.L. and shared the information
On cross-examination, T.C. stated that she was not sure exactly when the incident in the bathroom occurred, but it was before kindergarten — probably when she was four or five years old. She recalled only that one event.
Ms. Isaac also spoke to A.L., who was 13, at her middle school. Her impression was that A.L. was truthful about her allegations and that she had been violated by her father. Although she was embarrassed, A.L. was specific with her about the sexual abuse. Ms. Isaac observed that A.L. was hurt and had lost her trust because her mother did not believe her and was still letting Defendant come to the home to babysit A.L. and her siblings. Ms. Isaac believed that “this daddy needed to be out of this home ASAP,” and “the mother needed ... to come to the realization that her child has been molested by her father[.]”
During the course of the investigation, Ms. Isaac also interviewed Defendant. In response to questioning, Defendant told Ms. Isaac that he had been molested as a child by different people, but not his mother or father. He told her what happened between him and A.L. and that it occurred over a five-year period. His description of the acts corroborated that given by A.L. Defendant told Ms. Isaac that “sometimes [A.L.] was to wear these little short t-shirts and it would just be so provocative it just seemed as if she was seducing him.”
| inMs. Issac testified that Defendant also told her that only the kids were home when the incidents took place; his wife would be at work. Defendant related to Ms. Isaac that A.L.’s response during their time together was to say “no” and “stop.” She did not kiss or caress him back, but would just “lay there.” At that time, in 1993-94, because he admitted to the abuse and the parents agreed that Defendant would move out and seek treatment, the case was referred to family services with an eventual plan for reunification. According to Ms. Isaac, however, such a case would now automatically be reported to the appropriate police authority for arrest and prosecution.
A.L.’s and T.C.’s mother testified that she married Defendant and got pregnant with A.L. when she was 14 and Defendant was 16. Together they had three children, A.L., S.T., and T.C. She testified that she has worked as a cashier in the Wal-Mart pharmacy for 17 years.
The mother stated that, in late 1993, A.L. came to her after Defendant had left and after A.L.’s boyfriend told A.L. to tell her mother what was going on or he would. A.L. told her that Defendant had been molesting her and her mother called Defendant and told him not to come back to the home. She also told him that, if he did, she would kill him. Defendant told her that “it wasn’t what it seems,” but he agreed not to come home.
The mother testified that Defendant started seeing a counselor and said he was doing better and she “made the wrong decision in believing him” and let him move back home. Defendant never admitted or denied the allegations, just said it “was not what it seems.”
In The mother testified that she remembered talking to Ms. Isaac and getting upset about the details of the abuse. She agreed that Defendant needed to stay away from the children. At that point, Defendant was living elsewhere, but was “coming and going” from the home. A social worker observed Defendant at home *136 and, not long after that, A.L. and T.C. were removed from the home and placed in foster care.
'S.T. testified that he is the brother of A.L. and T.C. He is the middle child. Recalling events from his childhood, S.T. testified that he noticed strange things going on between his father and A.L., ie., Defendant and A.L. being behind a locked door “doing homework,” which happened more than once. According to S.T., Defendant admitted to him that he molested A.L. S.T. was about 17 years old at that time. S.T. further testified that Defendant told him that he was molested by his father when he was younger and S.T. believed that Defendant was justifying his actions. S.T. stated that he felt responsible because he did nothing to stop the abuse.
At the time of trial, S.B., the third victim, was 6 years old and in the first grade. Recall that S.B. is Defendant’s nephew’s biological daughter. When asked who her parents were, S.B. correctly related their names as J.B. and M.B. S.B. also named her brothers and knew who was older and younger.
According to the testimony of S.B.’s mother, father and Defendant, Defendant’s nephew and Ms family, including S.B., had been living together in at least three or four other locations within the previous two years. In 2006, the nephew’s three children (including S.B. who was then three years | 13old) went to live with Defendant because their mother was having “like a nervous breakdown” and she needed to take some time so they could “get back on their feet.” S.B.’s mother testified that the kids had also lived with Defendant and his wife off and on for a time prior to that occasion. At some point, the mother took the oldest child back home with her to see if she could handle one child before having them all at home, leaving S.B. and one other sibling with Defendant. There was much testimony about money allegedly being paid to Defendant or by Defendant to his nephew for help with bills, but it is undisputed that his nephew and wife placed S.B. in the sole care of Defendant and his then current wife for a period of time.
The mother testified that she met Defendant about eight years prior to the trial. S.B. was approximately three years old and the younger boy was two years old when they first went to live with Defendant. At the time, Defendant was living on Pelican Lodge Road. S.B. and one sibling lived with Defendant and his wife for ten months to a year in a trailer in Shreveport. Thereafter, Defendant moved to Mississippi ■ because of a work release program and S.B. moved as well.[3]
The record also reflects that Defendant was, at some point, trying to adopt the children. The mother testified that she wanted “to give him a chance to take the kids” following her “nervous breakdown” because she did not believe she could give them what they needed (basic essentials— _Jfood,13 clothing, shelter) at that time. When asked if the adoption was stopped because Defendant got arrested and the kids were taken away, the mother said, “It’s not true,” and that she did not recall the de *137 tails. She testified that they never went to court or filed any papers, but she was going to let Defendant adopt the children. Defendant was arrested after he and the children had been living in Mississippi for a couple of months.
After allegations of sexual abuse arose, S.B. was interviewed at Gingerbread House. Crystal Clark testified that she is a family advocate/forensic interviewer at Gingerbread House. She interviewed 4-year-old S.B. at Gingerbread House twice, on June 19 and 20, 2008. The second interview was necessary because Det. Brooks needed to determine exactly where (Louisiana or Mississippi) the touching incident described by S.B. in the first interview occurred.
During the first interview, S.B. told Ms. Crystal that she lived with “Terry Terry Terry,” her dad and mom. When she was three and four, when Terry would come into her bedroom, she would pretend to be asleep, but she was not. He would wake her up and “pinch” her butt and vagina with his hand. He always told her he loved her. When asked what she called her private area, S.B. said that her mama called it a vagina. In the second interview, S.B. told them that the abuse happened in the new house where they live now (travel trailer in Mississippi) and the old trailer house where they were before they moved (in Vivian on Old Atlanta Road).
114Gingerbread House videos were played for the jury. S.B. responded affirmatively when asked if she was in the videos and whether everything she said in the videos was the truth.
On cross-examination, S.B. stated that she told Ms. Crystal in the video that her father’s name was “Jonathan Terry Terry Terry” and her mother’s name was “Terry Terry Terry.” When asked at trial, S.B. stated that her parents’ names were J.B. and M.B. (the correct names). S.B. stated that she was living in a trailer in Mississippi when “these things” happened to her. S.B. was questioned about drawings of both male and female figures presented to her during her interview at Gingerbread House. S.B. said that she was asked names of certain body parts, which she called “vagina and the butt.” S.B. was questioned further and she said she called both her mother and father “Terry Terry Terry.” S.B. said she was identifying her father, J.B., as the one doing “things” to her during the interview at Gingerbread House.
On redirect, S.B. properly identified her mother and father by their names. S.B. identified “Terry Terry Terry” as her father’s brother. S.B. stated that she never lived with “Terry Terry Terry.” S.B. again stated that she was referring to her father J.B. when she told Ms. Crystal that “Terry Terry Terry” was doing certain things to her. In her testimony, the interviewer (Ms. Crystal) described the anatomical drawings labeled by her and S.B. for the jury.
Dr. Springer examined S.B. on June 29, 2008. Dr. Springer testified that the col-poscopic exam of S.B. showed chronic irritation of her vulva and |1slabia majora. There was also chronic irritation secondary to poor hygiene and S.B. had a yeast infection. Dr. Springer observed tissue separation of S.B.’s hymen in a pie-shaped wedge at the 12:00 and 6:00 positions. According to Dr. Springer, her observations were consistent with sexual abuse and digital penetration. Her diagnosis of S.B. was physical neglect (hygiene and yeast infection) and sexual abuse.
According to Dr. Springer, no other physician has contacted her regarding her findings.
S.B.’s mother testified that she believed the medical evidence was being fabricated *138 and that S.B. was just telling “kid stories” or had been coached to make such accusations. She did not believe that Defendant had done anything that he was accused of doing. S.B.’s father was of the same mind until he was made aware of Dr. Springer’s findings; however, ultimately he testified that he does not believe Defendant did anything wrong to S.B.
JaLes Washington also testified. Ms. Washington is a Caddo Child Protection Investigator who was involved in the 2008 investigation of Defendant when he was living with S.B. and family. Ms. Washington testified that she contacted Defendant and he told her he was taking care of his nephew’s kids because their parents were unfit — the father was basically “no good.” Defendant related to Ms. Washington that he was trying to adopt the kids. At one point, Defendant left a voice mail message for Ms. Washington stating that he had never molested anyone. Significantly, the allegations of molestation had not been disclosed to him at that time.
|16Ms. Washington further testified that, after speaking with Dr. Springer and seeing S.B.’s Gingerbread House videos, she felt that this was a valid case. Ms. Washington discussed a plan with them, whereby the children were to be kept away from Defendant. The family was referred to intensive in-home care to help them find a home more suitable for the children because of the inadequate shelter issue. She testified that her investigation revealed that Defendant, his wife and the children (including S.B.) were living in Mississippi for several months prior to Defendant’s arrest.
Det. Brooks testified that A.L. called her on June 16, 2008, to report that she had been sexually molested by Defendant for several years beginning when she was a small child. According to Det. Brooks, A.L. called at this time because she had told Defendant that, if she ever found out he had children, she would call and report what he had done to her. A.L. told Det. Brooks that, back in 1993, she thought that her father had pled guilty to molesting her and had gone to jail. She found out later that he was never arrested and charges were never brought.
Det. Brooks then started looking for the old files. She contacted Ms. Washington, who was able to locate them. Ms. Washington provided Det. Brooks with documents which revealed that, in 1993, Defendant confessed to molesting A.L. for five years. A.L. was 13 at the time. Det. Brooks contacted the investigator and case worker from the 1993 investigation. Investigators told her that Defendant had been remorseful and tearful and that they did not think he would re-offend, so they did not |17call the Sheriffs Office at that time. OCS’s plan was that Defendant was not to come back to the family home. An OCS worker made an unannounced visit and found Defendant there. As described earlier in this opinion, the girls were then removed from the home for a year.
Det. Brooks further testified that she spoke with T.C., who told her she had blocked out a lot of what had occurred during her childhood, but remembered one incident in the bathroom where Defendant kissed her passionately and she felt pressure on her vagina from Defendant’s hand or penis. According to Det. Brooks, T.C. did not disclose this in the earlier investigation because she was scared her family would break up. Det. Brooks’ felt that the sisters were concerned because they believed that people who molest children do not stop. Since Defendant was living with his nephew’s children, their concern was to make sure those children were safe, especially since Defendant was trying to adopt them.
*139 Det. Brooks also corroborated other testimony regarding Defendant’s confession to S.T., the brother of A.L. and T.C. Det. Brooks testified that she spoke with S.T. and he related to her the statement by his father that he had molested A.L.
Det. Brooks also testified about her meetings and discussions with S.B.’s parents. She explained that S.B.’s mother stated to her that Defendant was a really good man, a good provider for the children. S.B.’s mother did not want the children taken away; she told Det. Brooks that she was crying because Defendant was paying their bills and he would stop if they took the children. Based on the parents’ reaction — they were mad |18about the accusations and would not believe it — Det. Brooks did not think they would cooperate and keep the children away from Defendant.
Det. Brooks testified that she was unable to get Defendant’s cooperation with the investigation. It was Det. Brooks’ belief that Defendant was arrested in another state. She explained that she received a call from an officer in another jurisdiction who told her that Defendant was traveling with a woman; and, when they stopped at a store, the woman went inside and gave a worker a note stating that the man she was with had kidnapped her. Det. Brooks explained that this is how Defendant was located. Defense counsel objected and the jury was admonished to disregard Det. Brooks’ hearsay testimony about an out-of-state arrest because there were no allegations or evidence of kidnapping against Defendant in Louisiana or outside the state. Instead, upon learning of his arrest warrant, Defendant voluntarily returned to Louisiana and turned himself in.
Defendant’s current wife testified on his-behalf. She testified that she has been married to Defendant since March 2004 and they had no children of their marriage; but, on May 8, 2006, his nephew’s three children, including S.B., began living with them. According to her testimony, several other adult and minor relatives lived with them sporadically through the relevant time period. At one point, she and Defendant just had the two youngest children of Defendant’s nephew, one of whom was S.B. Defendant’s wife testified that she was not working and was home every day. She testified that nothing happened to S.B. while she was in their 119home. She stated that the house was meticulous and the children were clean while they lived with them.
Defendant’s sister testified that she lived with Defendant and his wife on Old Atlanta Road in Vivian at the same time S.B. was in the home. She testified that she was not uncomfortable with Defendant being around S.B. because she knows “he did not do” what he is accused of doing. Defendant’s sister further testified that Defendant was never around S.B. by himself and that, when she was at work, Defendant’s wife was always there.
A former girlfriend of Defendant’s also testified on his behalf. She testified that she lived with Defendant from 1995 to 2000. They were in a relationship and were supposed to get married. Also in the household were her two children and S.T., Defendant’s son. She stated that Defendant was a father figure to her children. She explained that the only time she ever felt uncomfortable with her daughter being in Defendant’s presence was when A.L. sent a letter to Defendant about the molestation allegations. Defendant’s girlfriend opened the letter, read it and then asked her daughter whether Defendant had ever touched her in an inappropriate way, to which the girl replied, “no.” The daughter also testified at trial that Defendant never did anything inappropriate to her.
*140 Finally, Defendant testified on his own behalf. He acknowledged that he was accused of improper acts with A.L., but maintained that those things did not happen. Defendant stated that, other than running baths, he did not do anything to A.L. like what she alleged. According to Defendant, A.L. |2i>made the allegations because of tension between Defendant and her boyfriend.
According to Defendant, his son, S.T., blames his problems on Defendant not disciplining him more when he was young. S.T. disrespected his stepmother and did drugs, so they made him move out. He has not seen S.T. since then. Defendant testified that he never kissed T.C. passionately or touched her inappropriately.
Defendant testified that, during the 1993-94 investigation, he spoke with Ms. Isaac on the phone. He agreed to go to counseling and participated in requested psychiatric evaluations. He testified that he was at the state office building talking with Ms. Isaac when she turned the recorder off and stated, “We can go to court, I can put her (A.L.) on the stand, make her cry and you are going to do 20 to life.” Defendant testified that, in response, he told Ms. Isaac, “I’ll do what you want me to do.” He explained that the matter was in juvenile court and he remembers crying, answering questions and just leaving. According to Defendant, the case plan was for him to leave home, not be around the children and to go to counseling, after which there was to be a reevaluation then to see whether he could be reunited with his family.
Defendant acknowledged that he has one arrest, a domestic dispute in 2004 between him and his current wife. He testified that the couple took in his nephew’s children because their mother was in LSU Hospital with some mental issues, his nephew was out of work and they had financial problems. Defendant stated that he was trying to help them get back on their feet. |⅞1 Defendant testified that he never did anything inappropriate to S.B. while she was living with him and his wife.
On cross-examination, Defendant stated that neither Ms. Isaac, Det. Brooks, Ms. Washington, Dr. Springer nor the prosecutor liked him because of the charges against him. He stated that, for this reason, Det. Brooks fabricated the charges against him, as did Dr. Springer about the evidence regarding tears in S.B.’s hymen. He also testified that Ms. Isaac falsified charges and was lying. Defendant denied telling Ms. Isaac that he had been molesting A.L. for five years. However, he then told the jury that he actually did tell her that because he did not want to go to prison. According to Defendant, everything Ms. Isaac testified to about his “confession” was perjury. He maintained that he never admitted specifics or details; he just admitted the charges so he would not go to prison. Defendant also admitted that he did confess under oath to the same charges in juvenile court.
Defendant suggested that A.L. came to court 17 years after the fact to testify against him because he would not let her see her boyfriend in 1993. He also testified that A.L. made up the allegations because of a “whooping” he gave her when she refused to change clothes and cussed him out. In addition, Defendant claimed that A.L. and T.C. are lying about him apologizing to A.L. for molesting her when they went to see him at the jail. He also denied telling his son that he molested A.L. or that his parents molested him.
laAfter hearing all of the testimony, as described above, the jury found Defendant guilty on all three counts. This appeal ensued.

*141
DISCUSSION

Defendant’s appellate counsel raises the following assignments of error on appeal (verbatim):
1. The evidence adduced at trial is insufficient to support defendant’s convictions for molestation of a juvenile.
2. The trial court’s admonishment of the jury to disregard testimony regarding a “kidnapping” committed by defendant was insufficient to undo the prejudice caused by that testimony.
3. The matter should be remanded for resentencing because defendant’s sentences were prematurely imposed contrary to La. C. Cr. P. art. 873, the trial court failed to state the reasons for the sentences as required by La. C. Cr. P. art. 894.1, and the sentences are unconstitutionally excessive.
Defendant, pro se, also assigns the following as error (verbatim):
1. The evidence was insufficient evidence to support defendant’s conviction of molestation of a juvenile (in addition to those raised by Appellant’s Counsel in His Original Brief) Because The Elements Of The Crime Did Not Exist In Count # 2.
2. A. Procedural defect, abuse of discretion: The trial court failed to weigh the prejudicial affect of other crimes ‘alleged,’ against the judicial economy of a joinder.
B. This error, permitted the state to present inadmissible other crimes evidence which prejudiced defendant without meeting requirements of law. Therefore, the state was relieved of its burden of proof and many legal requirements.
3. Trial court erred: Abuse of discretion by denying motion to quash procedurally barred prosecution and applied a new law divesting defendant of substantive rights.
Insufficiency of the Evidence
Defendant challenges the sufficiency of the evidence to support the convictions, but only specifically argues the sufficiency of evidence with regards to Counts II and III. For completeness and out of an abundance of caution, this opinion includes a description of the testimony supporting the conviction on Count I, molestation of A.L., and we note that the evidence overwhelmingly supports the conviction on this count.

Argument and Applicable Law

According to defense counsel, Defendant’s conviction of molestation of T.C., Count II, should be reversed because the state failed to present any evidence that Defendant used any influence upon T.C. by virtue of his having a position of supervision or control over her in order to commit a lewd and lascivious act upon her. Additionally, T.C. was unable to say when the offense occurred, and the time range she provided allows for the possibility that the offense could have occurred prior to the beginning of the time frame alleged in the bill of information. In a pro se brief, Defendant also challenges the sufficiency of the evidence introduced by the state at trial to support his conviction on Count II.
Defense counsel also asserts that the evidence is insufficient to support Defendant’s conviction of molestation of S.B., Count III, in that: the state failed to prove that Defendant was the person referred to by S.B. in her Gingerbread House interview as the person involved; the state failed to prove that the acts occurred in Louisiana; the state did not establish that the acts of “pinching and squeezing” as described by S.B. constitute lewd and *142 1 ^lascivious acts; and S.B.’s testimony has so many internal contradictions that no rational fact finder could reasonably rely on her testimony to find Defendant guilty beyond a reasonable doubt.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132; State v. Murray, 36,137 (La.App.2d Cir.8/29/02), 827 So.2d 488, writ denied, 02-2634 (La.9/05/03), 852 So.2d 1020.
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Wiltcher, 41,981 (La.App.2d Cir.5/09/07), 956 So.2d 769; State v. Burd, 40,480 (La.App.2d Cir.1/27/06), 921 So.2d 219, writ denied, 06-1083 (La.11/09/06), 941 So.2d 35. Such testimony alone is sufficient even where the state does not introduce medical, scientific or physical evidence to prove the commission of the offense by defendant. State v. Robinson, 36,147 (La.App.2d Cir.12/11/02), 833 So.2d 1207; State v. Ponsell, 33,543 (La.App.2d Cir.8/23/00), 766 So.2d 678, writ denied, 00-2726 (La.10/12/01), 799 So.2d 490. See also State v. Johnson, 96-0950 (La.App. 4th Cir.8/20/97), 706 So.2d 468, writ denied, 98-0617 (La.7/02/98), 724 So.2d 203, cert. denied, 525 U.S. 1152, 119 S.Ct. 1054, 143 L.Ed.2d 60 (1999). The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Hill, 42,025 (La.App.2d Cir.5/09/07), 956 So.2d 758, writ denied, 07-1209 (La.12/14/07), 970 So.2d 529.
Molestation of a juvenile is defined in La. R.S. 14:81.2, in pertinent part, as: (A) Molestation of a juvenile is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person, by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile. Lack of knowledge of the juvenile’s age shall not be a defense.
The essential elements of the crime of molestation of a juvenile, each of which the prosecution must prove beyond a reasonable doubt, are (1) the accused was over the age of 17; (2) the accused committed a lewd or lascivious act upon the person or in the presence of a child under the age of 17; (3) the accused was more than two years older than the victim; (4) the accused had the specific intent to arouse or gratify either the child’s sexual desires or his or her own sexual desires; and (5) the accused committed the lewd or lascivious act by use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm or by the use of | ^influence by virtue of a position of control or supervision over the juvenile. La. R.S. 14:81.2; State v. LeBlanc, 506 So.2d 1197 (La.1987); State v. Watson, *143 39,362 (La.App.2d Cir.4/20/05), 900 So.2d 325; State v. Elzie, 37,920 (La.App.2d Cir.1/28/04), 865 So.2d 248, writ denied, 04-2289 (La.2/04/05), 893 So.2d 83.
For purposes of molestation of a juvenile, a “lewd or lascivious act” is one which tends to excite lust and to deprave morals with respect to sexual relations and which is obscene, indecent and related to sexual impurity or incontinence carried on in a wanton manner. State v. Redfearn, 44,709 (La.App.2d Cir.9/23/09), 22 So.3d 1078, writ denied, 09-2206 (La.4/09/10), 31 So.3d 381. The determination of whether or not an act is lewd or lascivious, for purposes of statute defining indecent behavior with a juvenile, depends upon the time, the place and all of the circumstances surrounding its commission, including the actual or implied intention of the actor. State v. Houston, 40,642 (La.App.2d Cir.3/10/06), 925 So.2d 690, writ denied, 06-0796 (La.10/13/06), 939 So.2d 373, appeal after new sentencing hearing, 41,743 (La.App.2d Cir.3/28/07), 954 So.2d 311.

Analysis: Sufficiency of Proof as to Count II

Defendant contends that the single act described by T.C., a sensual kiss when he was giving her a bath when she was four or five years old, is insufficient, standing alone, to meet the essential elements of the offense. Contrary to Defendant’s argument, however, there was more than just a “sensual” kiss. T.C. testified that she was naked and preparing for a bath when she was four or five years old; and, as she was stepping into the |27bathtub, Defendant kissed her passionately and then possibly touched her vaginal area with his hand or penis. The victim stated that she recalled some type of sensation in her genital area at the time, but she was not certain exactly what caused the sensation. T.C. did believe, however, that there may have been some touching by Defendant.
It is undisputed that T.C. was under the age of 17 years old at the time of the offense, Defendant was over the age of 17 years and their age difference was more than 2 years. It was reasonable for the jury to conclude that the kiss, as described by the victim, who was naked and getting into the bathtub, and who felt a “sensation” in her vaginal area at the same time, was a lewd and lascivious act. See State v. Boutte, 384 So.2d 773 (La.1980); State v. Anderson, 09-934 (La.App. 5th Cir.3/23/10), 38 So.3d 953, writ denied, 10-0908 (La.11/12/10), 49 So.3d 887; State v. Ragas, 607 So.2d 967 (La.App. 4th Cir.1992), writ denied, 612 So.2d 97 (La.1993); State v. Louviere, 602 So.2d 1042 (La.App. 4th Cir.1992), writ denied, 610 So.2d 796 (La.1993); State v. Rollins, 581 So.2d 379 (La.App. 4th Cir.1991); State v. Jacob, 461 So.2d 633 (La.App. 1st Cir.1984).
Furthermore, the state presented sufficient evidence to show that Defendant used his influence by virtue of his position of supervision or control over the victim in order to commit this offense. As T.C.’s biological father, who was still married to the victim’s mother and living with his family, Defendant was often the only parent at home with the children while his wife worked nights at Wal-Mart. Defendant clearly was in a supervisory capacity as he gave T.C. her bath, which is when the offense occurred. See State v. Goss, 46,193 (La.App.2d Cir.5/18/11), 70 So.3d 6; State v. A.B.M., 10-648 (La.App. 3d Cir.12/08/10), 52 So.3d 1021.
Finally, there is no merit to defense counsel’s contention that T.C.’s testimony left open the possibility that the offense happened outside the time frame alleged in the bill of information. T.C. testified that she remembered that this *144 incident occurred in the trailer on Riding Club Lane around 1990-91. Count II of the bill of information set forth a time frame of 1990-1994. This assignment of error is without merit.

Analysis: Sufficiency of the Evidence as to Count III

Defendant also urges that the evidence is insufficient to convict him of the molestation of S.B. because the state failed to prove that he was the person who committed the acts described by the victim in her Gingerbread House interview. Defendant also contends that the state failed to establish that the acts occurred in Louisiana and that the acts of “pinching and squeezing,” as described by the four-year-old victim in the Gingerbread House interview, were not sufficient acts to meet the definition of “lewd or lascivious acts” under La. R.S. 14:81.2. Finally, Defendant argues that the victim’s testimony contained internal conflicts; and, as such, no rational trier of fact could have reasonably relied on her testimony to find Defendant guilty beyond a reasonable doubt.
While there was some testimony by S.B. that she referred to both her biological father, J.B., and Defendant as “Dad,” she sufficiently identified Defendant to overcome any alleged confusion on the part of the youngj^victim, who stated that Defendant was the person who did those acts alleged by her.
During her interviews at Gingerbread House, S.B. described how Defendant touched and pinched on her vagina. The victim referred to Defendant as “Terry Terry Terry,” and it was revealed during the trial that she may have called others by the same name; however, S.B. provided sufficient information to show that she was indeed referring to Defendant and not her biological father as the person who touched her inappropriately. Specifically, S.B. stated that the inappropriate acts occurred while she was living with Defendant.
Molestation of a juvenile does not have, as an element of the offense, the place of the crime. State v. Rideout, 42,689 (La.App.2d Cir.10/31/07), 968 So.2d 1210, writ denied, 08-2745 (La.9/25/09), 18 So.3d 87. If a defendant feels that he is being charged for an offense that occurred in another parish, or that the state cannot prove the venue of the alleged crime, he must raise the issue before trial by a motion to quash; and it must be decided by the court before trial. La. C. Cr. P. art. 615. Venue is not considered an essential element to be proven by the state at trial; rather it is a jurisdictional matter to be proven by the state by a preponderance of the evidence and decided by the court in advance of trial. Id.; State v. Rideout, supra; State v. Gatch, 27,701 (La.App.2d Cir.2/28/96), 669 So.2d 676, writ denied, 96-0810 (La.9/20/96), 679 So.2d 429. In the instant case, Defendant failed to file a pretrial motion to quash; and, therefore, his objection to the issue of venue is not reviewable. State v. Pugh, 44,251 (La.App.2d Cir.5/27/09), 12 So.3d 1085; State v. Rideout, supra; State v. Mueller, 10-0710 (La.App. 4th Cir.12/08/10), 53 So.3d 677.
Even if the issue of venue had been properly and timely raised, there was testimony by witnesses to establish that some (or all) of the alleged criminal acts against S.B. did, in fact, occur in Caddo Parish. The location described by the victim in the Gingerbread House tape, as well as testimony from S.B.’s mother, was sufficient to establish that the acts occurred while Defendant and the children resided in Caddo Parish. T.B. testified that they were in Caddo Parish the majority of the time the children lived with Defendant. Furthermore, the place where the abuse *145 took place, as described by the victim, was Defendant’s home in Caddo Parish. See State v. McBroom, 27,027 (La.App.2d Cir.5/10/95), 655 So.2d 705.
In this case, several experts who interviewed or examined S.B. opined that there was ample evidence that S.B. had been sexually abused. There was also direct testimony from S.B. explaining what Defendant did to her and where. As previously noted by this court, the testimony of the victim alone is sufficient to prove the elements of the offense. State v. Humphries, 40,810 (La.App.2d Cir.4/12/06), 927 So.2d 650, writ denied, 06-1472 (La.12/15/06), 944 So.2d 1284; State v. Ingram, 29,172 (La.App.2d Cir.1/24/97), 688 So.2d 657, writ denied, 97-0566 (La.9/05/97), 700 So.2d 505. A reviewing court accords great deference to the jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Hill, supra. Furthermore, where there is conflicting evidence about factual matters, the resolution of which depends upon a determination of the |ai credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622, writs denied, 02-2595 (La.3/28/03), 840 So.2d 566, 02-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
Prejudicial “Other Crimes” Evidence
Defense counsel argues that false testimony by Det. Dorothy Brooks that Defendant committed a “kidnapping” was unduly prejudicial to Defendant and that the trial court’s admonishment regarding the testimony was insufficient to overcome the prejudice. According to Defendant, a new trial should be ordered due to the severe prejudice suffered by him as a result of the untrue and prejudicial testimony.
The state argues that Det. Brooks was not testifying as to Defendant’s character or his criminal convictions for the purposes contemplated in the applicable Code of Evidence provisions. Furthermore, it argues that the admonishment to the jury was sufficient; and Defendant suffered no prejudice, particularly as there was no evidence offered regarding the alleged kidnapping.
La. C.E. art. 404 provides that evidence of other crimes, acts or wrongs is generally not admissible. When a witness refers directly or indirectly to another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible, upon request of the defendant, the defendant’s remedy is a request for an admonition to the jury | S2or a mistrial pursuant to La. C. Cr. P. art. 771.[4] State v. Burns, 44,937 (La.App.2d Cir.2/02/10), 32 So.3d 261; State v. McGee, 39,336 (La.App.2d Cir.3/04/05), 895 So.2d 780; State v. Holmes, 02-2263 (La.App. 4th Cir.2/26/03), 841 So.2d 80.
As Det. Brooks was testifying about talking to Defendant about the allegations *146 of abuse involving S.B., Det. Brooks stated that she obtained a warrant for Defendant after he failed to show up for a meeting. Though Defendant did call twice, he did not report to the office as he claimed he would. Det. Brooks testified:
I obtained a warrant for him. And I think he was arrested in some other state because he left town. And as a matter of fact, I talked, I can’t even remember the name, I don’t know if it was a state trooper, but the guy told me that Mr. Terry was with the some [sic ] lady. And the lady — they stopped at a store, and she went in the store and handed them a note saying that he had kidnapped her or something. And that was how we got Mr. Terry, found out where he was at and then he turned hisself [sic ] in.
Mr. Broussard: After the fact, that you weren’t ever able to interview Mr. Terry at all, that didn’t work out.
Det. Brooks: No.
Mr. Broussard: If I could have just one moment, Your Honor.
(Pause.)
(Whereupon a discussion off the record was held.)
Mr. Broussard: I think that’s all I have for you, Detective Brooks.
|SjiDet. Brooks: Okay.

Cross-Examination

Mr. Clark: Detective Brooks, I’m not quite sure where to start with you, but I want to start at the end or your testimony. Now, you’ve said that Terry Terry — and he was married, wasn’t he to—
Det. Brooks: Jennifer.
Mr. Clark: —Jennifer. So it wasn’t just Mr. Terry with the children, was it? It was not just Terry with N.B. and/or J.B. and S.B.?
Det. Brooks: She said she had a mother.
Mr. Clark: Now, they were in Mississippi when you began your investigation, is that correct?
Det. Brooks: Yes.
Mr. Clark: And I want to know who it was and where they were that reported to you that Mr. Terry was under arrest with them. You said there was a police officer in another jurisdiction.
Det. Brooks: Okay.
Mr. Clark: Where was that and who was it?
Mr. Broussard: Your Honor, may we approach briefly?
(Whereupon a sidebar discussion was held.)
(Whereupon the jury was excused from the courtroom.)
The Court: For the record, we are going to bring Detective Brooks in for questioning outside the presence of the jury on a limited issue which is by agreement of the State and defense and Court.
(Whereupon the witness returned to the courtroom and was seated in the witness stand.)
|R4Outside of the jury’s presence, Det. Brooks then stated that a bulletin was put out for Defendant after it was learned that he had left town, but law enforcement officers did not know what state he was in at that time. Det. Brooks said that they received numerous calls and were told that Defendant was traveling in a red Jeep. Detective Brooks went on to say that she was “thinking” that it was within “our” jurisdiction; however, she found out that it was not. As she recalls, once the authorities arrived at the store, Defendant had already left. Defendant later turned himself in to “our jail.” Since it was outside the jurisdiction, Det. Brooks did not include the information in her report. Det. *147 Brooks stated that she did not have any farther information on the alleged kidnapping victim. Det. Brooks stated that she believed that Defendant would eventually turn himself in and that is what, in fact, happened.
At that point, the state indicated that the matter had been discussed with Det. Brooks and there would be no further mention of any other crimes, including any alleged kidnapping. The state acknowledged that Defendant did voluntarily surrender himself. Defense counsel stated:
Well, I was under the impression the admonishment was coming from the Court and not from counsel and that therefore I would yield to the Court to admonish the witness.
The Court: All right. For the record, we are outside the presence of the jury, and at this time the jury will be admonished when they come in. However, Detective Brooks, I am going to admonish you not to make reference to any allegations or any possible evidence of kidnapping or anything like that which as far as the Court is concerned did not take place.
The jury was then admonished outside the presence of Det. Brooks.
IssThe Court: All right. Ladies and gentlemen of the jury, first of all, I apologize for the inconvenience, but let me admonish you that there are no allegations or any evidence of any kidnapping involving this defendant in the State of Louisiana or outside the State of Louisiana. In addition, upon learning of his arrest, the defendant voluntarily returned to Louisiana and turned himself in.
(Sidebar discussion.)
The Court: All right. Ladies and gentlemen, let me further admonish you that there are no allegations or evidence that he was running from the State of Louisiana to avoid prosecution. So with those two things that I have admonished, you are to disregard any testimony or any evidence of such allegations. Thank you very much.
The record does not show that defense counsel raised a contemporaneous objection to the testimony of Det. Brooks regarding the alleged kidnapping. Instead, it appears from the record that defense counsel was attempting to impeach the testimony of the detective on that issue. However, once the state asked for a bench conference, there was, apparently, an agreement made that further testimony on the matter would be elicited outside of the jury’s presence.
As noted above, Det. Brooks was not a court official within the meaning of La. C. Cr. P. art. 770. The trial court appropriately admonished the jury to disregard the remarks and no mistrial was declared. While there was a reference to the alleged kidnapping during Det. Brooks’ direct testimony, the state did not ask the witness to elaborate on the allegations. On the other hand, defense counsel did question the detective further about the kidnapping remark during cross-examination. At that point, the state requested a bench conference and questioning on the matter was ^discontinued and the trial judge told the jury there was no evidence of kidnapping and that Defendant voluntarily turned himself in. This assignment of error is without merit.
Sentencing Issues
Defense counsel asserts that the trial court sentenced Defendant immediately following the denial of his post-trial motions without Defendant waiving the time delays set forth in La. C. Cr. P. art. 873. Defendant also argues that the trial court *148 did not comply with the mandatory provisions of La. C. Cr. P. art. 894.1 in giving the considerations and factual basis for the sentences imposed. Finally, defense counsel contends that Defendant’s sentences are constitutionally excessive.
According to the state, Defendant did not suffer any prejudice as a result of the trial court’s failure to observe the article 873 delay; and, as such, remand for resen-tencing is unnecessary. The state points out that Defendant’s sentencing was continued at least four times, and Defendant knew that he was to be sentenced at the time his sentencing hearing was held. Additionally, there was no objection to Defendant’s sentencing after his motions were denied. Finally, the state notes that Defendant’s sentences are not excessive and points out that no contemporaneous objection was made to the sentences.

Failure to Follow Delays

La. C. Cr. P. art. 878 provides:
If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is I,^overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.
When the trial court imposes the sentences immediately after the denial of the defendant’s motions for new trial and post-verdict judgment of acquittal, there must be a showing on the record that the defendant waived the delay required by La. C. Cr. P. art. 873. However, when the defendant does not complain of actual prejudice, the error is subject to the harmless error analysis. See State v. Russell, 42,479 (La.App.2d Cir.9/26/07), 966 So.2d 154, writ denied, 07-2069 (La.3/07/08), 977 So.2d 897; State v. Wilson, 469 So.2d 1087 (La.App. 2d Cir.1985), writ denied, 475 So.2d 778 (La.1985).
Defendant filed several post-trial motions on the day of sentencing. The trial court failed to observe the 24-hour sentencing delays as required by La. C. Cr. P. art. 873. While Defendant has alleged prejudice from this, his only argument is that the sentences imposed were maximum sentences. This standing alone is insufficient to prove prejudice by imposition of the sentences without observance of the delay. Defendant did not object to the immediate sentencing on the day of imposition; and, furthermore, Defendant did not raise the issue in his motion to reconsider sentence. As such, Defendant has failed to show actual prejudice. Accordingly, this claim is without merit.

Consideration of La. C. Cr. P. art. 894.1

The test imposed by the reviewing court in determining the exces-siveness of a sentence is two-pronged. First, the record must show |ssthat the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Lathan, 41,855 (La.App.2d Cir.2/28/07), 953 So.2d 890, writ denied, 07-0805 (La.3/28/08), 978 So.2d 297. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982); State v. Egan, 44,879 (La. *149 App.2d Cir.12/09/09), 26 So.3d 938; State v. Swayzer, 43,350 (La.App.2d Cir.8/13/08), 989 So.2d 267, writ denied, 08-2697 (La.9/18/09), 17 So.3d 388.
Following Defendant’s conviction, a presentence investigation report was ordered. While the trial court did not specifically indicate which sentencing factors it considered in sentencing Defendant, the record is replete with information to form an adequate factual basis for Defendant’s sentences. The trial judge indicated that he believed there was sufficient testimony to support that Defendant had, in fact, committed the crimes, including Defendant’s admissions regarding A.L. The trial court also noted that, based on the longevity of the acts, it would appear that, if given the opportunity, Defendant would commit the same type of crime. Prior to sentencing, the trial court reviewed Defendant’s presentence investigation |S9report. Considering these factors, we find that there was sufficient compliance with the mandates of La. C. Cr. P. art. 894.1; and, as such, a remand is unnecessary.

Constitutional Excessiveness

The second prong is that a determination be made regarding the constitutional excessiveness of a sentence. A sentence violates La. Const. Art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Smith, 01-2574 (La.1/14/03), 839 So.2d 1; State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, 01-0467 (La.1/15/02), 805 So.2d 166; State v. Lobato, 603 So.2d 739 (La.1992); State v. Robinson, 40,983 (La.App.2d Cir.1/24/07), 948 So.2d 379; State v. Bradford, 29,519 (La.App.2d Cir.4/02/97), 691 So.2d 864.
The trial judge is given wide discretion in the imposition of sentences within the statutory limits, and the sentence imposed by him should not be set aside as excessive in the absence of a manifest abuse of his discretion. State v. Williams, 03-3514 (La.12/13/04), 893 So.2d 7; State v. Thompson, 02-0333 (La.4/09/03), 842 So.2d 330; State v. Hardy, 39,233 (La.App.2d Cir.1/26/05), 892 So.2d 710. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. State v. Cook, 95-2784 (La.5/31/96), 674 So.2d 957, cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).
The law in effect at the time of the commission of the offense is determinative of the penalty which the convicted accused must suffer. State v. Sugasti, 01-3407 (La.6/21/02), 820 So.2d 518; State v. Morrison, 45,620 (La.App.2d Cir.11/24/10), 55 So.3d 856.
La. R.S. 14:81.2 was enacted in 1984. The subsection under which Defendant was sentenced as to Counts I and II at the time of the offenses reads as follows:
(C) Whoever commits the crime of molestation of a juvenile when the offender has control or supervision over the juvenile shall be fined not more than ten thousand dollars, or imprisoned, with or without hard labor, for not less than one nor more than fifteen years, or both.
La. R.S. 14:81.2 has been amended several times and the subsection under which Defendant was sentenced as to Count III provided (at the time of the offense) that:
(E)(1) Whoever commits the crime of molestation of a juvenile when the victim *150 is under the age of thirteen years shall be imprisoned at hard labor for not less than twenty-five years nor more than ninety-nine years. At least twenty-five years of the sentence imposed shall be served without benefit of probation, parole, or suspension of sentence.
Defendant was sentenced to concurrent sentences of 15 years’ imprisonment at hard labor on Counts I and II and 50 years’ imprisonment at hard labor on Count III with credit for time served. Twenty-five years of the 50-year sentence was ordered to be served without benefit of parole, probation or suspension of sentence. Defendant was notified of his requirement to register as a sex offender upon his release, and the trial judge 141 imposed 30 days in the parish jail “in lieu” of court costs. Defendant’s timely motion to reconsider sentence was denied by the trial judge.
Defendant’s sentences on Counts I and II of the bill of information were restricted to the maximum sentence available at the time of the commission of the crime — 15 years at hard labor. Considering the fact that Defendant preyed on his oldest daughter over a period of at least five years, this sentence is certainly not excessive. Based on A.L.’s testimony, it is obvious that she was deeply scarred by Defendant’s continued molestation of her throughout her childhood. Defendant used his relationship with his daughter as a substitute for what was lacking in his marriage as he discussed his dreams, issues and problems with her while repeatedly violating her. Defendant also brought his younger daughter into the twisted activities as he violated her at a very young age. There is nothing about these sentences that shocks the sense of justice.
With regard to the penalty on Count III, the trial court imposed a mid-range sentence. Considering Defendant’s repeat behavior, the age of the victim, Defendant’s refusal to accept responsibility for his actions, as well as his apparent inability to be rehabilitated, it cannot be said that this sentence is excessive. The trial court certainly could have imposed a greater sentence for this offense. The trial court’s reasoning and the record provide ample justification for imposition of this sentence. This sentence does not shock the sense of justice.
This assignment of error is without merit.
l42Pro Se Assignments of Error

Failure to Grant Motion to Sever

According to Defendant, the trial court’s failure to grant his motion to sever was an abuse of discretion. Defendant also argues that the denial of the motion to sever caused severe prejudicial harm to him as impermissible other crimes evidence was automatically admitted during the trial. According to Defendant, the other crimes evidence of Counts I and II was too old to have a bearing on the most recent offense. Defendant also contends that the evidence was admitted only upon a verbal request by the state not to sever the charges.
Defendant asserts that the state was “afforded the luxury of never having to enumerate its rationale of the use of the other ‘crimes’ evidence or its relevance to the issue at hand, one charge to the other.” According to Defendant, the state was not required to prove that the evidence was not being admitted to prove character; therefore, the state was permitted to bypass procedural and jurisprudential law requirements. Defendant takes the position that the joinder of the offenses was improper as it allowed the admission of *151 evidence that was not relevant to all charges.
La. C.E. art. 412.2 provides:
A. When an accused is charged with a crime involving sexually assaultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused’s commission of another crime, wrong, or act involving sexually assaultive behavior or acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.
|4SB. In a case in which the state intends to offer evidence under the provisions of this Article, the prosecution shall, upon request of the accused, provide reasonable notice in advance of trial of the nature of any such evidence it intends to introduce at trial for such purposes.
C. This Article shall not be construed to limit the admission or consideration of evidence under any other rule.
La. C. Cr. P. art. 493 provides:
Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.
La. C.Cr.P. art. 493.2 provides:
Notwithstanding the provisions of Article 493, offenses in which punishment is necessarily confinement at hard labor may be charged in the same indictment or information with offenses in which the punishment may be confinement at hard labor, provided that the joined offenses are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan. Cases so joined shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.
On the second day of jury selection, before the prospective jurors were brought into court, defense counsel moved to sever, seeking a separate trial for Count III. Defense counsel argued that Counts I and II were punishable with or without hard labor, while Count III carried a mandatory hard labor sentence. Defense counsel also pointed out that Count III would have to be tried by a 12-person jury, while Counts I and II could be tried by 144a 6-person jury. It was Defendant’s position that the state was trying to circumvent a 6-person jury with a mandatory unanimous verdict requirement and combine it with a 12-person jury that required only 10 jurors to concur to reach a verdict. Counsel also argued that Defendant could not be denied his right to be tried on Counts I and II by a 6-person jury. The state objected to the motion as untimely and also argued that the offenses could be tried jointly in accordance with La. C. Cr. P. art. 493.2. After hearing the arguments, the trial judge ruled that the offenses could be joined pursuant to La. C. Cr. P. arts. 493 and 493.2 and that Defendant’s request to sever was denied.
The trial court did not err in finding that the state could charge and prosecute the three felony offenses jointly in accordance with La. C. Cr. P. arts. 493 and 493.2. Offenses where hard labor confinement is required and offenses in which *152 hard labor confinement may be imposed can be tried jointly, provided the offenses are of the same or similar character. The three counts of molestation in which Defendant preyed on his daughters and then upon another young female relative in his custody are certainly of similar character and can even be considered to be part of a common scheme or plan. The trial judge correctly denied Defendant’s motion to sever. See State v. Humphries, 40,810 (La.App.2d Cir.4/12/06), 927 So.2d 650, writ denied, 06-1472 (La.12/15/06), 944 So.2d 1284; State v. Friday, 10-2309 (La.App. 1th Cir.6/17/11), 73 So.3d 913, writ denied, 11-1456 (La.4/20/12), 85 So.3d 1258.
| ^Failure to Grant Motion to Quash Prosecution
Defendant contends that he was deprived of a substantive right when the trial court applied the current version of La. C. Cr. P. art. 571.1 which extended the time period in which the state was allowed to file charges against him. According to Defendant, the statute is the only Louisiana statute that is “fixed, substantive, and mandatory.” Defendant’s interpretation of art. 571.1 is that the time period for filing the charges against him was a fixed period that began to run once the victims reached the age of 17.
La. C. Cr. P. art. 571.1 currently provides that:
Except as provided by Article 572 of this Chapter, the time within which to institute prosecution of the following sex offenses: sexual battery (R.S. 14:43.1), second degree sexual battery (R.S. 14:43.2), oral sexual battery (R.S. 14:43.3), felony carnal knowledge of a juvenile (R.S. 14:80), indecent behavior with juveniles (R.S. 14:81), molestation of a juvenile or a person with a physical or mental disability (R.S. 14:81.2), crime against nature (R.S. 14:89), aggravated crime against nature (R.S. 14:89.1), incest (R.S. 14:78), or aggravated incest (R.S. 14:78.1) which involves a victim under seventeen years of age, regardless of whether the crime involves force, serious physical injury, death, or is punishable by imprisonment at hard labor shall be thirty years. This thirty-year period begins to run when the victim attains the age of eighteen (Emphasis added).
La. C. Cr. P. art. 571.1 was amended in 2005 to extend the period of time in which prosecution could be instituted from 10 years to 30 years after the victim reached the age of 18. A.L. was born on January 31, 1980. The initial period within which the state would have been able to bring prosecution against Defendant was 10 years from A.L.’s birthday on January 31, 1998, until January 31, 2008. La. C. Cr. P. art. 571.1 was | ^amended in 2005, which was before the initial period of limitations against Defendant would have run. Therefore, the increased period of limitations of 30 years is applicable to the three offenses with which Defendant was charged.[5] See State v. Adkisson, 602 So.2d 718 (La.1992); State v. Anderson, 10-779 (La.App. 5th Cir.3/27/12), 91 So.3d 1080. As noted by the supreme court in State v. Ferrie, 243 La. 416, 144 So.2d 380, 384 (La.1962), abrogated on other grounds by State ex rel. Olivieri v. State, 00-0172 (La.2/21/01), 779 So.2d 735:
In the absence of a statute of limitations, the State retains the right to prosecute for crimes indefinitely. But when a *153 right of grace has been extended, the State relinquishes the right to prosecute once the statute of limitations has run; until it does run, the State’s right to prosecute is retained and may be extended at the will of the State.
This claim is without merit.

CONCLUSION

For the foregoing reasons, the convictions and sentences of Defendant Terry Lynn Terry are affirmed.
AFFIRMED.

. In accordance with La. R.S. 46:1844(W), the victims and minors associated with this case will be referred to herein by their initials only.

. As will be noted below, the sentencing range changed following the commission of the first two offenses.

. Prior to the children going to live with Defendant, OCS was involved with the family while they were all living with Defendant and his mother. The mother testified that OCS stated that there was not enough room in the house and that there wére issues with cleanliness of the residence and animals living inside of the home. OCS was also involved with the family about a year and a half before Defendant’s trial when S.B. was burned after she was playing with a lighter. Another incident that OCS investigated occurred when S.B. took narcotic pain medication she found on the floor of the home while in the care of a babysitter.

. A mistrial shall be granted upon motion of the defendant when a remark or comment is made within the hearing of the jury by the judge, district attorney or court official during trial or in argument and that remark refers to another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible. La. C. Cr. P. art. 770(2); State v. Smith, 43,136 (La.App.2d Cir.4/23/08), 981 So.2d 200; State v. Ellis, 42,520 (La.App.2d Cir.9/26/07), 966 So.2d 139, writ denied, 07-2190 (La.4/04/08), 978 So.2d 325. For purposes of article 770, a law enforcement officer is not considered a "court official,” and an unsolicited, unresponsive reference to other crimes evidence made by a law enforcement officer is not grounds for a mandatory mistrial under La. C. Cr. P. art. 770. Id.

. There is likewise no limitations problem with the charges involving T.C. or S.B., both of whom were born later than A.L.